FILED
2008 May-06  PM 05:52
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## EASTERN DIVISION

| | | |
|---|---|---|
| **CHARLES R. WHEELER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CV-06-BE-2055-E** |
| | ) | |
| **CINGULAR WIRELESS, II,** *et al*. | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

## DEFENDANT AT&T MOBILITY LLC'S

## MOTION FOR SUMMARY JUDGMENT AND SUPPORTING BRIEF

OF COUNSEL:
Patrick R. Norris
3300 Vestavia Centre
2090 Columbiana Rd.
Birmingham, AL  35216

Jere F. White
Madeline H. Haikala
Enrique J. Gimenez
Lightfoot, Franklin & White, L.L.C.
400 20th Street North
Birmingham, AL 35203

# TABLE OF CONTENTS

**STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS** ........... 2

    **A.**    **The Accident at Issue Occurred While Independent Contractors ALT and Betacom Replaced Equipment at a Cell Tower Site in Talledega.**........................................................................................ 2

    **B.**    **The Independent Contractors on the Talladega Project had Their Own Safety Policies for their Employees** ........................................ 5

    **C.**    **Betacom Employees Wheeler and Cotton Were Experienced Tower Workers Who Knew that Tower Contractors Were Working on the Talladega Site**.......................................................... 6

    **D.**    **The Talladega Site Project Managers Monitored the Independent Contractors' Progress on the Equipment Installations**.................. 8

    **E.**    **While ALT Employees Lowered an Antenna from the Tower, their Rope Broke.  The Antenna Fell, and Wheeler Allegedly was Injured as He Ran from the Antenna**............................................... 9

**ARGUMENT** ....................................................................................... 12

**I.**    **TO OVERCOME CINGULAR'S MOTION FOR SUMMARY JUDGMENT, WHEELER MUST PRESENT SUBSTANTIAL EVIDENCE IN SUPPORT OF EACH ELEMENT OF HIS CLAIMS** 13

**II.**    **AS A MATTER OF LAW, CINGULAR, THE OWNER OF THE TOWER PROJECT, DID NOT OWE A DUTY TO WHEELER, THE EMPLOYEE OF AN INDEPDENDENT CONTRACTOR WORKING ON THE PROJECT.** ................................................................. 15

    A.    As a Matter of Law, Alabama's "No Duty" Rule Eliminates Wheeler's Premises Liability Claim.................................................... 16

    B.    This Case Does Not Fall Within the "Control" Exception to the "No Duty" Rule because Wheeler Cannot Prove by Substantial Evidence that Cingular Controlled the Manner in which the Independent Contractors at the Tower Site Performed their Work ........................ 19

C.    The Inherently Dangerous Activity Exception to the "No Duty" Rule Does Not Apply in this Case because Construction Work is not Inherently Dangerous if an Independent Contractor Exercises Proper Care ................................................................................................. 23

**III.   THE ELEVENTH CIRCUIT DOES NOT RECOGNIZE THE MULTI-EMPLOYER DOCTRINE, AND OSHA HAS ABANDONED THE DOCTRINE** ............................................................................................. 26

**IV.   WHEELER'S VICARIOUS LIABILITY CLAIM AGAINST CINGULAR FAILS AS A MATTER OF LAW BECAUSE, ABSENT EXCEPTIONS NOT APPLICABLE HERE, ONE IS NOT RESPONSIBLE FOR THE ALLEGEDLY NEGLIGENT OR WANTON ACTS OF AN INDEPENDENT CONTRACTOR** ................. 29

**CONCLUSION** ..................................................................................................... 30

**CERTIFICATE OF SERVICE** ............................................................................ 30

## **AT&T MOBILITY, LLC'S MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Defendant

AT&T Mobility, LLC, formerly Cingular Wireless, LLC ("Cingular"), moves the

Court for summary judgment in its favor and against Plaintiff Randall Wheeler

("Wheeler") on his claims against Cingular. Those claims arise out of an accident

that occurred at a cell tower site in Talladega, Alabama where Wheeler, an

employee of an independent contractor, was installing equipment in a CIngular

equipment shelter. Under well-settled Alabama law, Wheeler cannot prove by

substantial evidence that Cingular owed a duty to him or that Cingular was

vicariously liable for the work of ALT or WesTower, subcontractors on the tower

project. Cingular therefore is entitled to judgment as a matter of law. In support of

its Motion for Summary Judgment, Cingular shows the Court the following:

1

## STATEMENT OF UNDISPUTED RELEVANT MATERIAL FACTS

### A.      The Accident at Issue Occurred While Independent Contractors ALT and Betacom Replaced Equipment at a Cell Tower Site in Talledega.

1.      Cingular is a provider of wireless voice and data communications services. Cingular Evidentiary Submission Tab 1, Newberry Affidavit.[1] The unprecedented accident at issue occurred during the modification of a cell tower site in Talledega, Alabama. Tab 2, Wheeler Depo., p. 100; Tab 3, 5-16-07 Josh Cook Depo., pp. 284-85.

2.      Cingular leases the Talladega tower site from Crown Castle. Tab 4, Roth Depo. pp. 221-22. The site includes a 400 foot cell tower and a Cingular equipment shelter that sits beside the tower. Tab 5, Stoehr Depo., p. 15; Tab 6, Newberry Depo., p. 145.

3.      According to Cingular's specifications for the site modification, antennas on the tower were to be replaced, and a new, 30 foot long concrete shelter was to be installed at the base of the tower. Tab 2, pp. 66, 127; Tab 3, p. 367; Tab 6, p. 65. New equipment was slated for the equipment building. Tab 6, pp. 70-73.

---

[1] Cingular files its motion for summary judgment on Wheeler's claims separately from its summary judgment motion on Patricia Cotton's claims because the facts of and the claims in the two cases are slightly different. All cites in this motion are to the evidentiary submission that Cingular has filed in support of both motions.

4.     Independent contractors performed the modifications at the Talladega site.   NSORO, LLC ("NSORO") agreed to replace the antennas on the tower. NSORO subcontracted the tower work to WesTower Communications. WesTower, in turn, subcontracted the work to ALT, Inc.   Tab 2, pp. 368-69; Tab 3 p. 137; Tab 4, pp. 258-59.   Cingular accepted Betacom Incorporated's bid to install equipment in the new equipment shelter.   Tab 2, p. 458; Tab 6, p. 63.

5.     Wheeler is an employee of Betacom Incorporated ("Betacom").   On March 10, 2006, he walked out of Cingular's concrete equipment shelter to go to lunch, the rope that ALT was using to lower an antenna broke, causing the 50 pound antenna to fall approximately 200 feet.   Wheeler dove under a truck to avoid the antenna.   He allegedly scraped his shoulder and his elbow and hurt his back. Tab 2, pp. 168, 170, 231-32, 372-73.   The antenna hit Bubba Cotton, a member of the Betacom crew.   Cotton died instantaneously.

6.     Under its Master Supplier Agreement with Cingular, Betacom was solely responsible for the work that it performed under the contract.   Section 4.7 of the Betacom agreement states:

> a.   SUPPLIER is engaged in an independent business and will perform all obligations under this Agreement as an independent contractor and not as the agent or employee of CINGULAR;

3

    b.  SUPPLIER's personnel performing Services shall be considered solely the employees of SUPPLIER and not employees or agents of CINGULAR;

    c.  SUPPLIER has and retains the right to exercise full control of and supervision over the performance of the Services and full control over the employment, direction, assignment, compensation, and discharge of all personnel performing the Services.  Tab 1, Ex. A, §4.7.

7.      Betacom agreed to supply and install the materials that Cingular requested according to Cingular's specifications.  The contract requires Betacom to "provide flexibility in the way it allocates its resources" so that Betacom can meet Cingular's forecast deadlines.

> SUPPLIER agrees to complete all required development and acquisition of technology, according to the schedule provided in the applicable product supplement, that meet the Specifications as described in this Agreement.  SUPPLIER also agrees to allocate sufficient engineering, manufacturing and Installation capacity to provide al (sic.) required Materials and/or Services to achieve the pace of deployment as described in the applicable product supplement.  SUPPLIER understands that this forecast is subject to change and agrees to provide flexibility in the way it allocates is resources so that CINGULAR's actual demand can be met.  Id., Ex. A, § 3.9(a)(1).

8.      The Betacom Supplier Agreement gave Cingular the option to inspect Betacom's work:

> When CINGULAR's Order for Goods to be furnished by SUPPLIER under this Agreement does require Installation of the Goods, CINGULAR may inspect completed portions on such Installation.  Id., Ex. A, § 3.9(c)(2).

4

**B.     The Independent Contractors on the Talladega Project had
Their Own Safety Policies for their Employees.**

9.      In 2005, Cingular issued a contractor safety policy letter that requires

each contractor on a tower site to have a formal safety program.  The letter states:

> every contractor (and subcontractor) [at a tower site] must have a
> safety program that assures compliance with all applicable safety
> regulations and Cingular requirements. All contractors who work
> for Cingular must have (1) A safety program that establishes sound,
> definite and comprehensive safety measures commensurate with the
> project [and] (2) Appropriate safety-related training. Tab 7, Depew
> Depo, Ex. 8; see also, Tab 4, pp. 269-70.

10.     The Betacom safety policy manual in effect at the time of the

Talladega project provides that, "[i]t is the responsibility of the individual

employee to know and follow the safety practices for any duty being performed,

whether or not that duty is part of the employee's regular job." Tab 2, pp. 44-45,

Ex. 8 §1.02.  Furthermore, "It is the policy of the company . . . to provide and

maintain proper safety throughout its operations.  It is expected that each

supervisor will immediately take reasonable steps to resolve any problem or

potential problem concerning safety and health of the employee." Id. at §1.03.

11.     Wheeler, the Betacom crew leader on the Talladega project,

acknowledges that he was responsible for the safety of the Betacom employees at

the tower site.  Id. at 428.  He testified that it was his duty, "to make sure that there

5

was no hazardous things that would hurt" him or his co-employees. <u>Id.</u> at 59-60;

428 ("My duties are to make sure the people on my crew do not get hurt").

12.    ALT also had a safety policy.  Tab 3, pp. 335-37.  ALT crewmembers

had a "tailgate safety meeting" every morning before they began working.  <u>Id.</u> at

34-35.  Josh Cook, the ALT tower foreman, completed daily safety reports and

submitted those and other workplace safety forms to WesTower.  <u>Id.</u> at 29, 32, 36,

213-14.  Cook was responsible for the safety of his crew members.  <u>Id.</u> at 26-28.

### C.    <u>Betacom Employees Wheeler and Cotton Were Experienced Tower Workers Who Knew that Tower Contractors Were Working on the Talladega Site.</u>

13.    The Talladega site modification was but one of many tower projects

on which Wheeler and Cotton had worked.  Both men received formal tower

training.  Tab 2, pp. 86-87.  In fact, Wheeler began working on towers in 1985 and

had climbed approximately 400 towers to raise, lower and install equipment.  <u>Id.</u> at

83-84, 91.  Cotton worked on towers for one year before he moved to ground-level

equipment work.  <u>Id.</u> at 89.  Wheeler had been a crew leader for Betacom for eight

years at the time of the accident.  <u>Id.</u> at 58.

14.    A cell tower is surrounded by a drop or fall zone.  The radius of the

drop zone is half of the height of the tower.  Tab 3, pp. 45-47, 93.  Consequently,

the 400 foot Talladega tower has a 200 foot "drop zone."  Wheeler knew that items

could fall from towers and that they might fly out from the tower over significant distances. Tab 2, p. 100 ("I have seen things ricochet as far as, you know, a hundred and fifty feet away from a two hundred foot tower"). In recognition of the fact that items can fall from towers, Betacom's safety policy provides that, "*[h]ard hats . . . be worn by the grounds personnel when there is someone on the tower.*" §5.05 (emphasis supplied).[2] Workers in the tower industry know that if someone yells "headache," it means that something is falling from a tower. Tab 2, p. 104.

15.    At the time of the accident, Wheeler and Cotton had been working at the tower site on and off for ten days. The men knew that an ALT tower crew was working on the site too. On the day before the accident, the ALT crew members spent time in the equipment shelter with Cotton and Wheeler because the weather was not suitable for tower work. Tab 2, p. 70. The men from the two crews visited with each other and talked about their tower experience. Id. at 70-73; Tab 3, pp. 65, 300, 360. At the end of the day, Josh Cook stored tools and supplies in the equipment building because of the inclement weather. Tab 3, pp. 59-60.

---

[2] Cingular does not contend that a hard hat would have prevented Mr. Cotton's injury. The Betacom policy reflects the contractor's knowledge that items can fall from towers.

7

### D.   The Talladega Site Project Managers Monitored the Independent Contractors' Progress on the Equipment Installations.

16.    In the days preceding the accident, Damon Depew, the project manager for the tower work, visited the Talladega site. So did Don Stoehr and Scott Ingram, Cingular equipment technicians. Tab 2, pp. 403-04, 408; Tab 5, pp. 28, 30. One of the men allegedly reminded Wheeler that Betacom's work in the equipment shelter had to be done before the upcoming Talladega race. Tab 2, p. 416.[3] Wheeler was confident that he and the other Betacom employees would be able to complete the equipment installation on time. Id. at 64, 392-93. He stated that, "[t]here's nothing unusual about us getting pressure put on us." Id. at 422.

17.    Damon Depew spoke to the ALT employees at the site. ALT's tower foreman, Josh Cook, asked whether the ALT crew could have more time to complete its work. Tab 2, pp. 78-79; Tab 3, pp. 180-81, 307. Depew purportedly called Terry Newberry, the head of the equipment division of Cingular's engineering department who oversaw Cingular's projected timetable for the project, and conveyed Cook's question. Id. at 307-08. Depew testified that Newberry told him that all of the contractors had deadlines to meet, and the

---

[3] Wheeler contends that he had this conversation with Don Stoehr, a Cingular field engineer. Tab 2, pp. 416-17. Stoehr does not recall this conversation. Tab 4, pp. 30-31, 124-25. For the purposes of this motion only, reading the record in the light most favorable to plaintiff, Cingular will assume that this conversation occurred.

8

contractors had to resolve scheduling conflicts among themselves. Depew

conveyed this information to Cook. Tab 7, pp. 121-22.[4]  Josh Cook stated that

ALT and Betacom "should be able to work together" to resolve scheduling

questions. Tab 3, p. 316.

18.     Depew and Gabe Gruzynski, the project manager for the equipment

shelter, monitored the overall progress on the Talladega project during weekly

Wednesday phone conferences with various Cingular representatives. Tab 6, p. 48.

## E.     While ALT Employees were Lowered an Antenna from the Tower, their Rope Broke.  The Antenna Fell, Striking Betacom's Cotton as He Walked Across the Tower Site.

19. On the morning of the accident, Friday, March 10, 2006, Wheeler and

Cotton arrived at the site early and entered the concrete equipment building.  While

they were working, the ALT crew arrived. Tab 3, pp. 57-58.  At their morning

safety meeting, the ALT crew discussed the fact that they would be working

overhead while other contractors were on site.  Josh Cook decided to proceed with

the tower work.  Id. at 206, 246, 364, 366-67.  Two ALT employees climbed the

---

[4]Newberry does not recall this conversation, and there is no record of a
telephone call to him from the tower site on March 9, 2006.  Depew denies visiting
the site. Tab 7, p. 49.  He testified that he and Josh Cook discussed tower work
over the phone.  For the purposes of this summary judgment motion, Cingular
presents this evidence in the light most favorable to Plaintiff, expressly reserving
the right to contest Plaintiff's rendition of the evidence if the Court denies
Cingular's summary judgment motion.

tower and began rigging it with ropes so that they could lower some of the old antennas. Meanwhile, Josh Cook walked to the equipment building where Cotton and Wheeler were working to gather the tools that he left in the building the night before. Tab 2, p. 125; Tab 3, pp. 61, 64-65. Wheeler knew that the ALT crew was working on the site on the day of the accident. Tab 2, pp. 135, 433, 440.

20.     It took the ALT crew more than two hours to set up the ropes on the tower. Tab 3, pp. 72-73. While the ALT crew was rigging the tower, Wheeler walked back and forth across the tower site to get cable from his truck. He contends that he did not see the ALT crew members on the tower. Tab 2, pp. 140-41, 144.     As the ALT crew finished rigging the first antenna, two more Betacom employees, Eric Davis and Jason Cook, arrived and walked across the site to the building where Cotton and Wheeler were working. Tab 3, pp. 111-12. Once inside the building, Betacom's Cook and Davis discussed out loud the work that ALT was doing on the tower, but neither Jason Cook nor Davis knows whether Wheeler heard the discussion. Tab 8, Jason Cook Depo., pp. 20-21, 77-79.

21.     Outside, the two ALT employees on the tower signaled ALT foreman Josh Cook that they were ready to lower the first antenna. Because he could not see the equipment building from where he stood beside a truck to operate the capstan hoist to lower the antenna, Cook walked over to the equipment building to

10

make certain that all of the Betacom people were inside. Tab 3, pp. 113-14, 126.

He did not enter the building to tell the Betacom employees that ALT was about to

lower the first antenna. Id. at 122, 125. Cook walked back to the truck, and the

ALT crew members began lowering the antenna. Id. at 225-27.

22.    At the same time, the four Betacom employees decided to break for

lunch. The Betacom men had to cross the tower's 200 foot drop zone. As they

walked out of the equipment building, none of them -- not even the two who knew

that ALT was working on the tower -- looked up to see what was happening on the

tower. None of them surveyed the tower area to see where the tower crew was

working. Tab 2, p. 443; Tab 8, p. 77. Contrary to Betacom's safety policy, none

of the Betacom employees was wearing a hard hat. Tab 2, p. 460.

23.    Wheeler left the building first; Cotton walked out last. Tab 2, p. 147-

48. As Cotton exited, the short rope on the antenna broke. Tab 3, pp. 222, 228,

297, 324.[5] The antenna fell approximately 200 feet and struck Cotton in the back

of his head. Cotton died instantly. Id. at 209, 230. Wheeler contends that he

scraped his arm and hurt his back as he dove under a truck to avoid the antenna.

---

[5]It is undisputed that Cingular does not do tower work. It did not supply the
rope, and it did not inspect ALT's equipment. Tab 3, pp. 278-79, 355, 364.

11

24.     Wheeler sued Cingular, WesTower, ALT and other defendants. He asserts a premises liability claims against Cingular, and he contends that Cingular is vicariously liable for ALT or WesTower's alleged negligence or wantonness. Complaint. Discovery in this matter has been exhaustive. The undisputed material facts compel summary judgment in favor of Cingular.

## **ARGUMENT**

Wheeler, an employee of independent contractor Betacom, cannot prove by substantial evidence that Cingular, the owner of the Talladega tower project, owed a duty to him. Under Alabama law, the owner or occupant of a construction site ordinarily does not have a duty to warn employees of an independent contractor about hidden hazards on the site unless the owner/occupant has superior knowledge of the alleged hazard. It is undisputed that Wheeler knew that the ALT tower crew was working on the site on the day of the accident.

Alabama law provides an exception to the general "no duty" rule if the premises owner controls *the manner* in which the contractor performed its work. It is undisputed that Cingular does not do tower work. Cingular did not control the manner in which ALT lowered the antenna from the tower, nor did Cingular tell

12

Betacom how to do its work or when to break from its work for lunch.[6] A second exception to the "no duty" rule arises when the work being performed is intrinsically or inherently dangerous. Alabama law provides that construction work is not inherently dangerous.

Cingular did not have a duty to coordinate the work of the independent contractors at the Talladega site under OSHA's multi-employer doctrine. OSHA recently abandoned the doctrine, and this Circuit does not recognize the former OSHA theory. In the absence of substantial evidence of a duty, Cingular is entitled to summary judgment on Wheeler's claim.

## I.   WHEELER MUST PRESENT SUBSTANTIAL EVIDENCE IN SUPPORT OF EACH ELEMENT OF HIS CLAIMS.

Cingular is entitled to summary judgment on Wheeler's claims because "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Because Plaintiff, "'the non-moving party bears the ultimate burden of proof regarding the claim at issue, [she], in response to [Cingular's] properly supported motion, must go beyond the pleadings and establish, through competent evidence, that there truly is a genuine, material issue to be tried.'

---

[6] The absence of evidence of control also defeats Wheeler's vicarious liability claim against Cingular.

Celotex Corp. v. Catrett, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265
(1986). However, a 'mere 'scintilla' of evidence supporting [plaintiff's] position
will not suffice; there must be enough of a showing that the jury could reasonably
find for that party.' Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990). 'When
deciding whether summary judgment is appropriate, all evidence and reasonable
factual inferences drawn therefrom are reviewed in a light most favorable to the
non-moving party.' Rojas, 285 F.3d at 1341-42 (citation and quotation marks
omitted)."  Henderson v. Waffle House, Inc., 238 Fed. Appx. 499 (11th Cir. 2007).

     The Court "must view the evidence presented through the prism of the
substantive evidentiary burden."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
106 S.Ct. 2505, 2513 (1986).  "The burden of proof is a substantive issue and is
therefore controlled by state law in diversity cases."  Wynfield Inns v. Edward
Leroux Group, Inc., 896 F.2d 483, 491 (11th Cir. 1990)(citing Palmer v. Hoffman,
318 U.S. 109, 63 S.Ct. 477, 87 L.Ed. 645 (1943); United States for Use & Benefit
of General Elec. Supply Co. v. Wiring Inc., 646 F.2d 1037 (5th Cir. Unit B 1981)).
Under Alabama law, to overcome a motion for summary judgment, the plaintiff
must present substantial evidence in support of each element of her claim.  Bass v.
SouthTrust Bank of Baldwin County, 538 So. 2d 794, 797-98 (Ala. 1989).
"Evidence is 'substantial' if it is of 'such weight and quality that fair-minded
persons in the exercise of impartial judgment can reasonably that infer the existence of
14

the fact sought to be proved.'" Hobson v. American Cast Iron Pipe Co., 690 So. 2d

341, 344 (Ala. 1997) (quoting West v. Founders Life Assurance Co. of Florida,

547 So. 2d 870, 871 (Ala. 1989)).

## II.   WHEELER, THE EMPLOYEE OF AN INDEPENDENT CONTRACTOR, CANNOT PROVE BY SUBSTANTIAL EVIDENCE THAT CINGULAR, THE OWNER OF THE TOWER PROJECT, OWED HIM A DUTY.

The Eleventh Circuit Court of Appeals recently summarized the Alabama

law that governs Wheeler's premises liability claim.

> The general rule in Alabama is that 'a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work on the contract.' *Weeks v. Alabama Elec. Coop., Inc.,* 419 So.2d 1381, 1383 (Ala.1982). This rule will not apply if [the owner] 'retains or reserves the right to control the manner in which the independent contractor performs its work.' *Id.* If the right of control is retained, 'the relationship changes from one of premises owner and independent contractor to that of master and servant.' *Id.* (quotation omitted). But a master-servant relationship is not created 'when the owner merely retains the right to supervise or inspect work of an independent contractor as it progresses for the purpose of determining whether it is completed according to plans and specifications, and retains the right to stop work that is not properly done.' *Id.*

Calloway v. PPG Industries, Inc., 155 Fed. Appx. 450 (11th Cir. 2005)(brackets

omitted); see also, Edmondson v. Cooper Cameron Corporation, 374 F. Supp. 2d

1103, 1106-07 (M.D. Ala. 2005)("[a]s a general rule, because there is no agency

relationship between them, a premises owner owes no duty of care to employees of

an independent contractor with respect to working conditions arising during the

progress of the work on the contract . . . [however,] the owner may be liable if it

retains or reserves the right to control the manner in which the independent

contractor performs its work")(applying Alabama law); <u>Daniels v. Mead Coated</u>

<u>Board, Inc.</u>, 858 F. Supp. 1103, 1105 (M.D. Ala. 1994)(same).

A.   As a Matter of Law, Alabama's "No Duty" Rule Eliminates Wheeler's
     Premises Liability Claim.

In a premises liability action, an owner and an independent contractor

typically occupy the positions of invitor and invitee.  As such, under the "no duty"

rule,

> 'The owner of premises is not responsible to an independent
> contractor for injuries from defects or dangers which the
> contractor knows of, or ought to know.....'
>
> 'The duty to keep premises safe for invitees applies only to
> defects or conditions which are in the nature of hidden dangers,
> traps, snares, pitfalls, and the like, in that they are not known to
> the invitee, and would not be observed by him in the exercise of
> ordinary care. The invitee assumes all normal or ordinary risks
> attendant upon the use of the premises, and the owner or
> occupant is under no duty to reconstruct or alter the premises so
> as to obviate known and obvious dangers, nor is he liable for
> injury to an invitee resulting from a danger which was obvious or
> should have been observed in the exercise of reasonable care.'
>
> . . .
>
> 'The entire basis of an invitor's liability rests upon his superior
> knowledge of the danger which causes the invitee's injuries.

16

> Therefore, if that superior knowledge is lacking, as when the
> danger is obvious, the invitor cannot be held liable.'
>
> This rule of law defining the duty owed by a premises owner to
> an independent contractor applies equally to those employees of
> the independent contractor who are engaged in work in
> furtherance of the contract.

Pope v. City of Talladega, 602 So. 2d 890 (Ala. 1992) (affirming summary

judgment for owner on premises liability claims asserted by spouse of deceased

employee of independent contractor working near wall of an excavation site where

danger of cave in was or should have been obvious to the employee) (quoting

Bacon v. Dixie Bronze Co., 475 So. 2d 1177 Ala.1985)(citations omitted).

Wheeler worked for Betacom, the independent contractor that Cingular hired

to install new equipment in the new concrete equipment shelter. The Betacom

Supplier Agreement provides that Betacom supplies services under the agreement

as an independent contractor and that Betacom, "retains the right to exercise full

control of and supervision over the performance of the Services and full control

over the employment, direction, assignment, compensation, and discharge of all

personnel performing the Services." Tab 1, Ex. A §4.7. See Daniels, 858 F. Supp.

at 1105 ("to determine the status of the relationship between Mead and CBI, the

court must examine the written contract and the actions of the parties pursuant

thereto").

17

The undisputed evidence in this case demonstrates that Wheeler knew that objects might fall from the tower while he walked across the tower site. Wheeler had worked on tower sites for years. Before he switched to ground-level equipment work, Wheeler climbed cell towers and performed the type of work that ALT was doing on the day of the accident. Tab 2, pp. 88-89. Betacom's safety policy required Wheeler to wear a hard hat at the tower site when people were working on the tower for the obvious reason that things might fall from the tower. Tab 2, Ex. 8, §5.05.

Wheeler testified that although he knew that the ALT crew was on the site on March 10, he did not know that ALT was working on the tower. Alabama law imposes on Cingular a duty to alert the Betacom employees to the situation only if Cingular had superior knowledge of a hidden danger – that is, only if Cingular knew that the ALT crew was on the tower on the day of the accident, and the Betacom employees could not discover the fact for themselves. It is undisputed that no one from Cingular was on the tower site on the day of the accident. Wheeler, on the other hand, was working on the site, and he knew that the ALT crew was on the site too. As between Cingular and Wheeler, Wheeler had superior knowledge of the circumstances at the tower site on the day of the accident. Wheeler was in the best position to know whether someone was on the tower, a situation that would have been obvious had Wheeler bothered to look at the tower

18

or ask. Wheeler knew that if the ALT crew was working on the tower, something might fall from the tower. Tab 2, p. 100. Consequently, as a matter of law, Cingular did not have a duty to tell Wheeler that ALT was working on the tower and that something might fall from the tower.

B.  This Case Does Not Fall Within the "Control" Exception to the "No Duty" Rule because Wheeler Cannot Prove by Substantial Evidence that Cingular Controlled the Manner in which the Independent Contractors at the Tower Site Performed their Work.

Wheeler has not presented substantial evidence of control that would bring this case within the exception to the "no duty" rule. See Pope, 602 So. 2d 892 ("the general rule does not apply if the premises owner retains or reserves the right to control the manner in which the independent contractor performs its work"). "[T]he issue presented is whether . . . [the premises owner] retained the right to direct the *manner* in which [the contractor] performed its work." Pate v. U.S. Steel Corp., 393 So. 2d 992, 994 (Ala. 1981)(emphasis supplied).

The record demonstrates that Betacom and ALT made their own decisions about how to perform their contractual obligations. Betacom's Supplier Agreement gives Cingular the right to inspect Betacom's work. Cingular's field engineer, Don Stoehr, visited the site. Tab 2, pp. 57-58, 403-10. Wheeler admits that, "Don never told me how to do my job, no." Id. at 420. The project manager for the equipment work on the Talladega job gave Wheeler the floor plans for the

19

equipment placement over the phone. He did not visit the site. Id. at p. 60, 63,

423-24. There is no evidence that Cingular selected the rope for rigging the tower

or told ALT how to secure the rope to the antennas. It is undisputed that Cingular

does no tower work. Betacom updated Cingular on the status of the equipment

work on daily conference calls, and Cingular held a weekly conference call during

which all of the project managers for all of the tower upgrades in Alabama

discussed the status of the various projects. Id. at 410-11; Tab 6, p. 48.

Cingular required the contractors working at the Talladega site to comply

only with the contract specifications for the upgrade and to meet the project

deadlines. This level of oversight does not constitute control over the *manner* in

which the independent contractors performed their contractual obligations.

> The mere retention by the owner of the right to supervise or
> inspect work of an independent contractor as it progresses, for
> the purpose of determining whether it is completed according to
> plans and specifications, does not operate to create the relation of
> master and servant between the owner and those engaged in the
> work. This rule is not altered by the fact that the owner may stop
> work that is not properly done.

Pate, 393 So. 2d at 994 (emphasis supplied) (quoting 41 Am.Jur.2d *Independent*

*Contractor* §10 (1968)); see also Daniels, 858 F. Supp. at 1006 (applying Alabama

law and granting owner's motion for summary judgment because premises owner

did not owe duty to provide safe workplace where "[t]he only evidence of [the

20

owner's] direct participation in the project is that [the owner's] engineers visited the construction site daily to monitor [contractor's] progress and to insure that the construction complied with the specifications contained in the contract. . . . It is clear that the general rule in Alabama is that the mere monitoring of work of an independent contractor does not constitute control"); Stovall v. Universal Construction Company, 893 So. 2d 1090 (Ala. 2004)(rejecting plaintiff's claim that contractor controlled subcontractor's work because contractor supplied lighting that subcontractor used to work at night; "Indeed, the very essence of the contractor/subcontractor relationship hinges on the contractor's allowing the subcontractor to do his work without interference. The mere fact that Turner contracted to provide Penwal employees with lighting in no way translates into an automatic reservation of control over how that lighting is used")(summary judgment affirmed).

Moreover, there is no substantial evidence that Cingular endeavored to control the safety measures that the various contractors at the Talladega site employed. In 2005, Cingular issued a policy letter concerning contractor safety which provides that, "[i]t is the policy of Cingular Wireless that every contractor (and subcontractor) must have a safety program that assures compliance with all applicable safety regulations and Cingular requirements. All contractors who work for Cingular must have (1) A safety program that establishes sound, definite and

21

comprehensive safety measures commensurate with the project [and] (2)

Appropriate safety-related training." Tab 7, Ex. 8.  The undisputed evidence

demonstrates that the independent contractors at the Talledega site took

responsibility for the safety of their employees. Wheeler had a Betacom safety

policy manual that he received from Betacom in 2005.  Tab 2, pp. 44-45.  The

Betacom safety policy states that, "[i]t is the responsibility of the individual

employee to know and follow the safety practices for any duty being performed,

whether or not that duty is part of the employee's regular job." Tab 2, Ex. 8 §1.02.

Furthermore, "It is the policy of the [Betacom] . . . to provide and maintain proper

safety throughout its operations.  It is expected that each supervisor will

immediately take reasonable steps to resolve any problem or potential problem

concerning safety and health of the employee." Id. at §1.03.  Wheeler admitted

that he was responsible for the safety of his crew. Id. at 428.  He did not have

safety meetings with his crew because Betacom does not require them. Id. at 121-

22.  The ALT crew had daily safety meetings and submitted daily safety reports to

ALT. Tab 3, 29, 32, 34-36, 213-14

As a matter of law, "a 'general administrative responsibility for company-

wide safety' is insufficient to find liability for failure to provide a safe

workplace.'" Stovall, 893 So. 2d at 1098 (Ala. 2004)(quoting Kennemer v.

McFann, 470 So. 2d 1113, 1117 (Ala. 1985)).  Cingular's policy letter regarding

22

contractor safety does not give rise to a duty to control all of the safety issues on

the tower worksite. See Daniels, 858 F. Supp. at 1107-08 (granting summary

judgment where the owner supplied a safety manual to each contractor at its job

site and required compliance with the provisions of the manual; "With the

exception of general safety requirement, such as requiring all workers entering the

plant to have a hard hat, steel toe boots and glasses, Daniels received no other

direct safety instructions from Mead. . . . The contract between Mead and CBI

dictated that CBI was required to follow the safety standards maintained at the

Mead location while CBI was performing their work. As a result of the provisions

of the contract, Mead had the right to order CBI to maintain certain standards of

safety, but holding the right, Mead did not acquire a duty to do so").

C.   The Inherently Dangerous Activity Exception to the "No Duty" Rule Does
     Not Apply in this Case because Construction Work is not Inherently
     Dangerous if an Independent Contractor Exercises Proper Care.

In the absence of substantial evidence of control, an owner may owe the

employees of an independent contractor a duty when the work to be performed "is

an inherently and intrinsically dangerous activity." See Pope, 602 So. 2d at 892

("Pope argues that the City and the Board were liable because the excavation work

being performed was inherently dangerous"). The Alabama Supreme Court has

found that construction activities are not inherently or intrinsically dangerous.

23

'Ordinary building operations or activities, including both construction and demolition, are generally not considered work of an inherently or intrinsically dangerous character rendering the employer-owner liable for injuries resulting from the negligence of an independent contractor in doing the work....' 41 Am.Jur.2d Independent Contractors, § 43.'

Again, the work or undertaking being by no means necessarily dangerous, if proper care were exercised in its execution, any negligence in its prosecution (if any such there was) was merely in the mode and manner in which the contractor or his agents or servants were performing the work; and for this reason the defendant was not liable.

Bacon v. Dixie Bronze Co., 475 So. 2d 1177, 1181-82 (Ala.1985); see also, Stovall, 893 So. 2d at 1099 ("We cannot say that any work done by Elee on the night of his death constituted 'intrinsically dangerous' work. First, common sense dictates that painting from a ladder is simply not dangerous work, so long as the most rudimentary care is taken. Thus, this is not the sort of work where there is some risk of injury even when the worker exercises the utmost care and attention"); Pope, 602 So. 2d at 893 (construction work "would not be intrinsically dangerous if it had been performed with the exercise of reasonable care, skill and diligence" so premises owner did not have a non-delegable duty to ensure the safety of its premises); compare Boroughs v. Joiner, 337 So. 2d 340, 342 (Ala. 1976)(landowner may be held liable for negligence of cropduster because aerial application of insecticides by an independent contractor is an inherently dangerous

24

activity; "The Legislature of Alabama has recognized that insecticides and pesticides are intrinsically dangerous and has adopted statutes regulating the sale, distribution and application of those products in this state."); Bankers Fire & Marine Ins. Co. v. Bukacek, 123 So. 2d 157, 164 (Ala. 1960)(use of dynamite).

Wheeler has offered no evidence to prove that performing ground-level equipment work at a cell tower site is intrinsically dangerous if proper care is taken. The concrete equipment shelter in which Wheeler worked was located beside the tower. Wheeler knew that objects might fall from the tower. Tab 2, p. 429. Nevertheless, neither Wheeler nor any of the other three Betacom crew members who walked out of the building on the day of the accident looked up at the tower as they walked out of the equipment building into the drop zone – not even the two crew members who arrived at the site after the tower was rigged and who admit that they knew that the ALT crew was working overhead. In violation of Betacom's safety policy, none of the Betacom crew members bothered to bring their hard hats to the equipment building, much less wear them as they walked from the building across the drop zone. Moreover, there is no evidence that, when Josh Cook went into the equipment building where Cotton was working on Friday, March 10, Wheeler asked Cook whether the ALT crew would be working on the tower, even though Wheeler knew that (1) the Talladega race was approaching, (2) the bad weather that had prevented the ALT crew from climbing the tower the day

25

before had passed and (3) Cook had informed Wheeler the day before the accident that ALT would not be working on the tower at night.[7]  Wheeler testified that he never asked the ALT employees when they were going to work on the tower.  Tab 2, p. 83.  Given these circumstances and the fact that Wheeler, by his own admission, was responsible for the safety of his crew, it is clear that if Wheeler had taken the slightest care in the performance of his duties, he would have been able to cross the tower premises safely.  As a matter of law, the equipment work that the Betacom crew performed at the Talladega site was not intrinsically dangerous.

## III.   THE ELEVENTH CIRCUIT DOES NOT RECOGNIZE THE MULTI-EMPLOYER DOCTRINE, AND OSHA HAS ABANDONED THE DOCTRINE.

Finally, Plaintiff has suggested that Cingular may owe a duty to Cotton under the now-defunct "multi-employer doctrine."  The Eleventh Circuit Court of Appeals does not recognize the doctrine.

The multi-employer doctrine, initially formulated by the OSHA Review Commission in Grossman Steel & Aluminum Corp., 4 BNA OSHC 1185, 1188 (No. 12775, 1976), extended OSHA liability beyond an employee's immediate

---

[7] Josh Cook testified that on the morning of the accident, he told Wheeler that the ALT would be working on the tower. Tab 3, pp. 64-65. Wheeler disagrees. Tab 2, p. 125. For the purposes of this motion, Cingular assumes the truth of Wheeler's testimony because the Court must view the evidence in the light most favorable to Plaintiff. Cingular expressly reserves the right to challenge Wheeler's testimony if the Court denies Cingular's summary judgment motion.

employer to general contractors or others who had "supervisory capacity" at a jobsite and could "reasonably have been expected to prevent or abate" OSHA violations by reason of such supervisory capacity. Id. The OSHA Review Commission struck down the multi-employer doctrine last year, holding that 29 C.F.R. §1910.12(a) does extends responsibility for the safety of an employee on a construction site only to his or her immediate employer. 29 C.F.R. §1910.12(a) states:

> The standards prescribed in Part 1926 of this chapter are adopted as occupational safety and health standards under section 6 of the Act and shall apply, according to the provisions thereof, to every employment and place of employment of every employee engaged in construction work. Each employer shall protect the employment and places of employment of each of *his employees* engaged in construction work by complying with the appropriate standards prescribed in this paragraph. 29 C.F.R. §1910.12(a) (emphasis added).[8]

The Eleventh Circuit Court of Appeals never recognized the multi-employer theory. In <u>Jeter v. St. Regis Paper Co.</u>, 507 F.2d 973 (5th Cir. 1975), an employee of an independent painting contractor who was injured while painting a chemical silo brought an action against the owner of the silo, alleging that the owner owed him a duty to ensure a safe worksite pursuant to OSHA. The court disagreed.

---

[8] The Secretary of Labor appealed the decision to the United States Court of Appeals for the Eighth Circuit. That case, styled *Elaine Chao v. Summit Contractors,* No. 07-2191, remains pending.

> No cause of action…can be implied under OSHA to run in favor
> of a person who was not an employee of the violator against
> whom recovery is sought….[The silo owner] owes no duty to
> [the plaintiff] under OSHA. There being no duty, there can be
> no breach. The district court was correct in not submitting this
> theory of action to the jury.

Jeter, 507 F.2d at 977; see also, Barrera v. E.I. Du Pont de Nemours and Co., Inc.,

653 F.2d 915, 920 (5th Cir. Aug. 14, 1981)(in pipefitter's action against DuPont

for injuries received on the worksite, district court erred in charging the jury that

OSHA imposed a duty on DuPont "to furnish invitees, such as the Plaintiff, places

of employment which are free from recognized hazards . . . OSHA does not create

duties between employers and invitees, only between employers and their

employees; and it has long been settled in this circuit that, even between these

latter, it creates no private cause of action")[9]

   Because Wheeler has not, and indeed cannot, prove by substantial evidence

that Cingular, the owner of the tower project and occupier of the tower site, owed a

duty to him as an employee of independent contractor Betacom, Cingular is

entitled to summary judgment on Wheeler's premises liability claim.

---

   [9] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981), the
Eleventh Circuit adopted as precedent all decisions from the former Fifth Circuit
prior to October 1, 1981.

## IV.  WHEELER'S VICARIOUS LIABILITY CLAIM AGAINST CINGULAR FAILS AS A MATTER OF LAW .

As a matter of law, Cingular may not be found vicariously liable for ALT or WesTower's alleged negligent or wanton conduct.  ALT and WesTower were subcontractors on the Talladega project.  Under Alabama law, "'one is not ordinarily responsible for the negligent acts of his independent contractor.'"  Fike v. Peace, 964 So. 2d 651, 654 (Ala. 2007)(quoting Burroughs, 337 So. 2d at 342). In Fike, in answer to a certified question from the U.S. District Court for the Northern District, the Alabama Supreme Court explained that the exceptions to the general no vicarious liability rule are akin to the exceptions to the premises liability "no duty" rule:  vicarious liability may extend a party who hires an independent contractor to perform work if the work involves an inherently dangerous activity or if the law imposes a non-delegable duty upon the party hiring the contractor.  Id. at 654-65.  A non-delegable duty may arise out of statutes or caselaw.  Id. 658-60.

As discussed above, the Talladega project work was not intrinsically or inherently dangerous.  Furthermore, as discussed above, there are no statutes, regulations or viable OSHA doctrines that impose a non-delegable duty upon Cingular as the owner of the tower project, and the applicable Alabama caselaw attributes no such duty to Cingular.  Hence, Cingular is entitled to judgment as a

matter of law on Wheeler's attempt to hold Cingular vicariously liable for the

purported negligent or wanton conduct of subcontractors ALT and WesTower.

## CONCLUSION

Defendant AT&T Mobility, LLC (formerly Cingular Wireless, LLC)

respectfully asks the Court to grant ATT Mobility's Motion for Summary

Judgment.

/s/ Madeline H. Haikala
One of the Attorneys for
Defendant AT&T Mobility, LLC


OF COUNSEL:
Patrick R. Norris                    Jere F. White
3300 Vestavia Centre                 Madeline H. Haikala
2090 Columbiana Rd.                  Enrique J. Gimenez
Birmingham, AL  35216               Lightfoot, Franklin & White, L.L.C.
                                     400 20th Street North
                                     Birmingham, AL 35203

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the above and foregoing has been
electronically filed on this the 6th day of  May, 2008 with the Clerk of the Court
using the CM/ECF system which will send notification of such filing upon the
following.  If Notice of Electronic Filing indicates that Notice needs to be
delivered by other means to any of the following, I certify that a copy will be sent
via U.S. Mail, properly addressed, postage prepaid.

Clay J. Thomason                     James A. Shands
Thomason-Maples LLC                  205- 20th Street North
P O Box 627                          Suite 500
Bessemer, AL 35021                   Birmingham, AL  35203

30

M. Keith Gann
Joseph R. Duncan, Jr.
Huie, Fernambucq & Stewart, LLP
Three Protective Center
2801 Highway 280 South
Suite 200
Birmingham, AL  35223

J. Mitchell Frost, Jr.
Neal D. Moore, III
Ferguson, Frost & Dodson, LLP
2500 Acton Road, Suite 200
Birmingham, AL  35243

Richard E. Broughton
Tabor R. Novak
Ball, Ball, Matthews & Novak
P. O. Box 2148
Montgomery, AL  36109-5413

Charles P. Gaines
Lucius S. Gaines
Gaines, Gaines & Rasco
P. O. Box 275
Talladega, AL  35160

Edward McF. Johnson
Dennis G. Pantazis
Wiggins, Childs, Quinn & Pantazis
The Kress Building
301 19th Street North
Birmingham, AL  35203

Joseph L. Dean, Jr.
Dean & Barrett
457 South 10th Street
Opelika, AL  36803-0231

/s/ Madeline H. Haikala
Of Counsel

31