IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN  DIVISION

|  |  |
|---|---|
| CHARLES R. WHEELER, | } } } } |
| Plaintiffs, | } } } |
| v. | }          CV-06-BE-2055-E }  |
| CINGULAR Wireless, II, et. al. | } } |
| Defendants | } } } } |

## <u>MEMORANDUM OPINION</u>

This matter is before the court on "Motion for Summary Judgment by WesTower
Communications, Inc." (doc. 114) and "Defendant AT&T Mobility[1] LLC's Motion for Summary
Judgment and Supporting Brief" (doc. 119 [2]).  Wheeler asserts claims against Cingular for
premises liability and failure to warn, and asserts claims against WesTower for
negligence/wantonness and for liability under the doctrine of *res ipsa loquitur*.   For the reasons
stated in this memorandum opinion, the court will GRANT WesTower's motion and will
GRANT Cingular's motion.

---

[1]AT&T Mobility, LLC was formerly Cingular Wireless, LLC ("Cingular").  Because that
entity was known as Cingular at the time of the events made the basis of this lawsuit, the court
will use the designation of Cingular in this opinion.

[2] Document 118 is AT&T's motion for summary judgment in the related Cotton case.

1

## I.  FACTS

Viewed in the light most favorable to the Plaintiff (*see Scott v. Harris,* 127 S. Ct. 1769, 1776 (2007)), the following facts are material to the resolution of the instant motion.

 This case arises out of an on-the-job accident that occurred on March 10, 2006 at a cellular phone tower site in Talladega, Alabama.  Crown Castle leased the tower site to Defendant Cingular Wireless, LLC "Cingular" who in turn hired NSORO  to carry out antenna modifications on the 400-foot tower.[3]  NSORO then hired WesTower Communications, Inc. ("WesTower"), and WesTower contracted with Defendant ALT, Inc. ("ALT") as a contractor to perform the antenna modification.  Cingular had also contracted with  Beta Com, Inc. ("Beta Com")  to perform radio equipment upgrades at the site.  WesTower had no contractual relationship with Beta Com.

The day of the accident, two crews were working at the tower site: Beta Com and ALT.  Beta Com's work took place primarily inside a new concrete equipment shelter on site at the base of the tower.  Beta Com's crew consisted of four employees, including the Plaintiff, Charles R. Wheeler, who was the crew leader and responsible for the safety of the Beta Com crew at the job site.  He testified that it was his duty "to make sure that there was no hazardous things that would hurt" him or his co-employees.  Wheeler and some of his crew members, including "Bubba" Cotton,  had been working at the site off and on for approximately ten days.

The three-member ALT crew had worked on site the day before the accident, but had spent time in the equipment shelter with the Beta Com employees, because the weather was not suitable for tower work.  The men from the two crews visited with each other and talked about

_____

[3] Neither Crown Castle nor NSORO are presently parties to this action.

their tower experiences.  At the end of the day on March 9, 2006, ALT left tools and supplies in the shelter.  Because these tools and supplies were "ground work" equipment, Wheeler understood that the ALT crew would not be working overhead the next day.  However, on March 10, 2006, the day of the accident, ALT performed work in the tower; they were engaged in the removal and replacement of antennas and other equipment from the cell tower.

On the morning of March 10, 2008, Wheeler and Cotton arrived and began working inside the concrete shelter near the tower.  The Beta Com crew could not see or hear any work being performed on the tower from inside the shelter.   Wheeler knew that the ALT crew was also working on site that day, but Wheeler testified that he had understood that ALT would be working on the ground, not overhead in the tower.  A Cingular employee told him a few days before that the ALT crew would be working up in the tower on Monday, March 13, 2006, and based on that statement and the ground work equipment ALT had left in the shelter, he understood that ALT would not climb the tower before the next Monday.  He also testified that no one told him or told anyone else in his presence that ALT would be working in the tower that day nor did he hear any noises from the tower.

When the ALT crew arrived on site on March 10, the ALT crew leader, Josh Cook, gathered the tools from the shelter where Cotton and Wheeler were working.  ALT then spent approximately two hours setting up the ropes on the tower.  Neither Cingular nor WesTower provided ropes to ALT for use on this project; an ALT employee had purchased the ropes used in the rigging.  At 11:30 a.m., while ALT was rigging those ropes, Wheeler walked from the shelter to a truck to get a cable.  He claims that he did not notice anyone working in the tower or hear noise coming from the tower, but he also did not see the ALT crew working on the ground.

3

Wheeler was looking down at his wiring diagram and studying it on the way to the truck, and was unconcerned with the ALT crew at that time.  During the rigging process, two more Beta Com employees arrived and walked across the tower site to the shelter building.  Those two employees noticed the ALT crew on the tower and once they were inside the building, they discussed out loud the work that ALT was doing in the tower.  They did not know whether Wheeler heard their conversation, and Wheeler claims that he did not.

Shortly before the accident, the ALT employees in the tower signaled to their crew leader, Josh Cook, that they were ready to lower the first antenna.  Cook  walked over to the shelter to insure that the Beta Com crew members were inside, but he did not enter the building and tell them what his tower crew was doing.   Cook then walked back to the spot where he could operate a hoist to lower the antenna.

Wheeler and his crew exited the shelter to go lunch as the ALT crew was in the process of lowering an antenna from the tower.  Wheeler left the building first and Cotton walked out last.  The Beta Com crew had to cross the 200-foot radius drop zone to reach their vehicles.  As they walked out of the equipment shelter, none of the Beta Com crew members – not even the two who knew that ALT was working on the tower – looked up to see what was happening on the tower.  As the Beta Com employees exited the shelter, a polypropylene rope used to attach one of the antennas broke and caused the antenna to fall from a height of about 250 feet.  The ALT crew members called out the warning "headache" to signal a falling object, and Mr. Wheeler claims that he dove under a truck and injured his back to escape the falling antenna. The 50-pound antenna struck and killed Wheeler's crewmate, "Bubba" Cotton.

The Talladega site was one of many tower projects on which Wheeler and Cotton had

4

worked.  Both men had received formal tower training and had climbed towers to raise, lower

and install equipment.  Wheeler began working on towers in 1985 and had climbed

approximately 400 towers in the past, while Cotton had worked on towers for approximately one

year before he moved to ground-level equipment work.  Wheeler had been a crew leader off and

on for Beta Com approximately eight years at the time of the accident.   Wheeler knew that items

could fall from towers and that they might fly out from the tower over significant distances.  He

testified, "I have seen things ricochet as far as, you know, a hundred and fifty feet away from a

two hundred foot tower."  In recognition of the fact that items can fall from towers, Betacom's

safety policy provides that, "*[h]ard hats . . . be worn by the grounds personnel when there is*

*someone on the tower."*  (§ 5.05 Tab 2, p. 104).  Neither Wheeler nor any of his other crew

members was wearing a hard hat at the time of the accident.  Each cell tower is surrounded by a

drop or fall zone whose radius is half the height of the tower; the Talladega tower in question

was about 400 feet high, so the radius of its drop zone was 200 feet.

## Cingular

Cingular had no employees at the site at the time of the accident.  It had a contract with

Beta Com, who was at the site that day, but not with ALT.  Under its Master Supplier Agreement

with Cingular, Beta Com was solely responsible for the work it performed under the contract.

Section 4.7 of that agreement states:

a.  SUPPLIER [Beta Com] is engaged in an independent business and will
perform all obligations under this Agreement as an independent contractor and not
as the agent or employee of CINGULAR;

b.  SUPPLIER's personnel performing Services shall be considered solely the
employees of SUPPLIER and not employees or agents of CINGULAR;

c.  SUPPLIER has and retains the right to exercise full control of and supervision over the performance of the Services and full control over the employment, direction, assignment, compensation, and discharge of all personnel performing the Services.

Betacom agreed to supply and install the materials that Cingular requested according to Cingular's specifications.  In Section 3.9(a)(1), the contract requires Betacom to "provide flexibility in the way it allocates its resources" so that Betacom can meet Cingular's forecast deadlines:

> SUPPLIER agrees to complete all required development and acquisition of technology, according to the schedule provided in the applicable product supplement, that meet the Specifications as described in this Agreement. SUPPLIER also agrees to allocate sufficient engineering, manufacturing and Installation capacity to provide al (sic.) Required Materials and/or Services to achieve the pace of deployment as described in the applicable product supplement.  SUPPLIER understands that this forecast is subject to change and agrees to provide flexibility in the way it allocates is resources so that CINGULAR's actual demand can be met.

Section 3.9(c)(2) of the Betacom Supplier Agreement gave Cingular the option to inspect Betacom's work:

> When CINGULAR's Order for Goods to be furnished by SUPPLIER under this Agreement does require Installation of the Goods, CINGULAR may inspect completed portions on such Installation.

In 2005, Cingular issued a contractor safety policy letter that requires each contractor on a tower site, including Beta Com and WesTower, to have a formal safety program.  The letter states:

> every contractor (and subcontractor) [at a tower site] must have a safety program that assures compliance with all applicable safety regulations and Cingular requirements.  All contractors who work for Cingular must have (1) A safety program that establishes sound, definite and comprehensive safety measures commensurate with the project [and] (2) Appropriate safety-related training.

6

The Beta Com safety policy in effect at the time of the Talladega project provides that, "[i]t is the responsibility of the individual employee to know and follow the safety practices for any duty being performed, whether or not that duty is part of the employee's regular job. . . .It is the policy of the company . . . to provide and maintain proper safety throughout its operations.  It is expected that each supervisor will immediately take reasonable steps to resolve any problem or potential problem concerning safety and health of the employee."  Sections 1.02 & 1.03.

ALT also had a safety policy.  ALT crew members had a "tailgate safety meeting" every morning before they began working.  Josh Cook, the ALT tower foreman, completed daily safety reports and submitted those and other workplace safety forms to WesTower.

In the days preceding the accident, Damon Depew, the Cingular project manager for the tower work, visited the Talladega site, as did Don Stoehr and Scott Ingram, Cingular equipment technicians.  Don Stoehr was on site on March 7, 2006 and asked questions to Wheeler about the placement of various racks of equipment and asked where the microwave equipment was called for in the contract.  After calling Gabe Bruyznski, Cingular's project manager for the equipment shelter, Stoehr required the Beta Com crew to redo the placement based upon his understanding of the floor plans.  (Bruynski had previously explained to Wheeler over the phone about the floor plan, or placement of the various racks in the equipment shelter.)  Wheeler stated, however, that Stoehr never told him how to do his job.  Stoehr or Ingram allegedly reminded Wheeler that Beta Com's work in the equipment shelter had to be done before the upcoming Talladega race. Depew spoke to the ALT employees at the site, and Cook told Depew that he was uncomfortable working overhead of Beta Com and asked whether the ALT crew could have more time to complete its work.  Depew testified that he called Terry Newberry, the head of the equipment

division of Cingular's engineering department who oversaw Cingular's projected project

timetable, and relayed Cook's question.  Although Newberry does not recall the exact

conversation, Depew testified that Newberry told him that they had to stick to the deadline and

that the contractors would have to resolve scheduling conflicts among themselves.  Depew

conveyed this information to Cook, who stated that ALT and Beta Com "should be able to work

together" to resolve scheduling questions.

Depew and Bruyznski, monitored the overall progress on the Talladega project during

weekly Wednesday phone conferences with various Cingular representatives.

## WesTower

WesTower had no employees on site on the date of the accident.  It did, however, have a

contract in effect with ALT.   The contract in place between ALT and WesTower provides that

ALT is an independent contractor.  Specifically, it provides as follows:

> Neither subcontractor nor its lower tier subcontractors, nor the employees or
> agents of any of them, shall be deemed to be WesTower employees or agents, it
> being understood that Subcontractor and its lower tier subcontractors are
> independent for all purposes and at all times, and Subcontractor shall be wholly
> responsible for withholding and payment of all Federal, state and local income
> and other payroll taxes with respect to its employees, including contributions from
> them and as required by law.  **Subcontractor further acknowledges and agrees
> that it retains full right of control and supervision over the performance of
> the Work and the full right of control over the employment, direction, means,
> methods, assignment, compensation and discharge of all of its employees,
> agents, or subcontractors.**

(emphasis added) (Ex. C, WesTower/ALT subcontract, p. 5).

Further, the contract provides that ALT shall have the following general duties and

responsibilities:

> (a)      Subcontractor, at its own cost and expense, shall provide or cause

8

to be provided, design services, labor, materials, equipment, tools, construction equipment and machinery, water, heat, utilities, transportation, and any and all other facilities and services necessary for proper execution and completion of the Work, whether temporary or permanent and whether or not incorporated or to be incorporated into the Work.

(e)     Subcontractor shall use its best skill in the performance of the Work and shall utilize only qualified and appropriately licensed personnel, subcontractors, and other professionals, as applicable, selected and paid for by Subcontractor.

(g)     Subcontractor shall be responsible for and shall coordinate all construction means, methods, techniques, sequences and procedures, and all portions of the Work.

(j)     Subcontractor shall comply with all laws, ordinances, rules, regulations and lawful orders of public authorities, including, without limitation, the provisions of the Fair Labor Standards Act of 1938, as amended, and all other laws applicable to Subcontractor as an employer or Subcontractor of labor or otherwise.  Subcontractor shall review all laws, rules, regulations, building codes, electrical codes applicable to the design and construction of a Site, correlate such laws with the Contract Documents, and advise WesTower if any changes therein are necessary to comply with such laws.

(emphasis added) (Ex. C, WesTower/ALT subcontract, p. 1-2).

As to safety and health issues on the job site, the subcontractor, ALT,  had the following responsibilities:

(a)     Subcontractor shall be solely responsible for conducting its operations under this Agreement to avoid risk of harm to the health and safety of persons and property and for inspecting and monitoring all of its equipment, materials and work practices to ensure compliance under this Agreement. Subcontractor shall be solely responsible for adopting or developing or implementing a safety & health plan pursuant to the terms of Exhibit A, which is incorporated herein by reference, and to further abide by all Laws, rules and regulations of any Governmental Body concerning safety and environmental protection, including, but not limited to the Occupational Safety Health Act (OSHA), all Rules and Regulations established pursuant thereto, and all Amendments and Supplements thereto, and rules and regulations promulgated by any State operated safety and health agency established thereto.  Subcontractor acknowledges that compliance with the standards set forth in Exhibit A does not

9

relieve Subcontractor of its obligations to identify and address hazards not covered by its standards or the terms of Subcontractor's safety and health program.  Any Subcontractor safe practice, which differs from the safety requirements or standards, contained in this Agreement may only be implemented if it meets or exceeds the requirements contained herein.  Nothing contained herein precludes the implementation and application of safety and health provisions, which meet, exceed or supplement the requirements herein.

(b)     Subcontractor shall assume all responsibility and liability with respect to matters regarding the safety and health of its employees of lower tier subcontractors and suppliers and shall ensure that all of such subcontractors or suppliers fully comply with the safety and health provisions contained in this Agreement.

(c)     Subcontractor's failure to correct any unsafe condition or unsafe act by its employees, subcontractors of any tier, or suppliers may at the sole discretion of WesTower, be grounds for an order by WesTower to stop the affected work or operations until the unsafe act or condition is corrected to WesTower's satisfaction at Subcontractor's sole expense.  If the unsafe act or condition at Subcontractor's expense and backcharge Subcontractor for the costs associated with corrected the condition and/or may immediately terminate this Agreement.  Unless otherwise specified by WesTower, Subcontractor shall furnish all safety equipment required for the Work, require the use of such safety equipment, and provide safety instructions to its employees and subcontractors of any tier.

(d)     Subcontractor represents and warrants that none of its employees, agents, or lower tier subcontractors shall be permitted to climb a tower unless properly certified as having been trained in accordance with this Agreement, and as required by all applicable Laws, rules, regulations and in accordance with WesTower's policy.

(e)     Subcontractor shall develop and apply the necessary controls to ensure the quality of products and/or services based on existing proven working routine and practices that best reflects WesTower's planned and systematic approach toward achieving and maintaining the highest level of quality during all Work.  WesTower reserves the right to issue a "stop work" order at any time during the Work, when significant adverse quality trends and/or deviations are identified.

(Ex. C, WesTower/ALT subcontract, p. 4).

No WesTower employee was at the site on the date of the accident, but Jeremy Porch, a

10

WesTower employee, visited the site ten days before the accident and inspected ALT's rigging

equipment.  Another WesTower employee, Joe Williams, spoke to ALT employees over the

phone in the days leading up to the accident.  At one point, Williams pulled the ALT crew off the

site in question because numerous crews from other companies were on the site and working

outside around the tower; the site was too congested.  Subsequently, the ALT crew resumed work

at the site.  Cook tried to get in touch with Williams during the week of the accident because he

was uncomfortable about Beta Com working under him.  Williams was on vacation, but called

Cook back and suggested that the contractors work together to try to resolve the matter.  The last

time that the ALT crew spoke over the phone to WesTower about the status of the work was on

March 7 or March 8, a couple of days before the accident.


## II.  STANDARD OF REVIEW

Summary judgment is proper under Rule 56 of the Federal Rules of Civil Procedure "if

the pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any, show that there is no genuine issue as to any material fact . . . ."  *Celotex Corp.*

*v. Catrett*, 477 U.S. 317, 322 (1986)).  "[A] party seeking summary judgment always bears the

initial responsibility of informing the court of the basis for its motion and identifying [the

evidence that demonstrates] the absence of a genuine issue of material fact.  *Id.*  at 323.  After the

moving party demonstrates an absence of evidence to support the nonmoving party's case, the

nonmoving party "must do more than simply show that there is some metaphysical doubt as to

the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586

(1986).  If the evidence is "merely colorable, or is not significantly probative, summary judgment

may be granted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50 (1986).  Disagreement

between the parties is not significant unless the disagreement presents a "genuine issue of

material fact." *Anderson*, 477 U.S. at 247-48.  A dispute of material fact is genuine if a

reasonable jury, applying the relevant law to the evidence presented, could return a verdict for the

nonmoving party.  *See Barfield v. Brierton*, 883 F.2d 928, 933 (11th Cir. 1989).

When considering a motion for summary judgment, a court must view the facts "in the

light most favorable to the non-moving party . . . . ." *Harris*, 127 S. Ct. at 1776.  The court does

not "weigh the evidence and determine the truth of the matter" but rather, simply focuses on

whether a genuine issue of material fact exists.  *Anderson,* 477 U.S. at 249.   Where a reasonable

fact finder may "draw more than one inference from the facts, and if that inference introduces a

genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd of

Public Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007).  "[T]he plain language of

Rule 56( c) mandates the entry of summary judgment, after adequate time for discovery and upon

motion against a party who fails to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which the party will bear the burden of proof at

trial.  In such a situation, there can be 'no genuine issue of material fact,' since a complete failure

of proof concerning an essential element of the non-moving party's case necessarily renders all

other facts immaterial." *Celotex*, 477 U.S. at 322-23.

## III.  DISCUSSION

### A. Count Two of the Wheeler Complaint: Premises Liability against Cingular

In Count Two of his Complaint, Plaintiff Wheeler alleges that Cingular, as owner or

occupier of the premises, breached its duty to Wheeler as an invitee to keep the premises in a

reasonably safe condition and not to invite him into danger.

Under Alabama law, whether a duty exists is a legal question for the court to determine. *Wal-Mart Stores, Inc. v. Smitherman*, 872 So. 2d 833, 837 (Ala. 2003); *Ex parte Farmers Exch. Bank*, 783 So. 2d 24, 27 (Ala. 2000).  "[T]he principles regarding the legal duty of a premises owner to provide a safe place to work for employees of an independent contractor are well settled."  *Weeks v. Ala. Elec. Coop., Inc.*, 419 So. 2d 1381, 1383 (Ala. 1982).  Because of the absence of an agency relationship, "the general rule in Alabama is that 'a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions . . . ."  *Callaway v. PPG Indus., Inc.,* 155 Fed. App'x 450, 452 (11th Cir. 2005) (brackets omitted) (citing *Weeks*, 783 So. 2d at 1383); *see Edmondson v. Cooper Cameron Corp.*, 374 F. Supp. 2d 1103, 1006-07 (M.D. Ala. 2005) ("stating "[a]s a general rule, because there is no agency relationship between them, a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of work on the contract . . . .").

The Alabama Supreme Court explained the controlling law as follows:

> The [ ] cases firmly establish the general rule that a premises owner owes no duty of care to employees of an independent contractor with respect to working conditions arising during the progress of the work on the contract.  "The general rule does not apply, however, if the premises owner retains or reserves the right to control the manner in which the independent contractor performs its work." *Thompson v. City of Bayou La Batre*, 399 So. 2d [292] at 294 [(Ala. 1981)]; *Hughes v. Hughes*, 367 So. 2d [1384,] at 1386 [ (Ala 1979)].  "When the right of control is reserved, the relationship changes from one of premises owner and independent contractor to that of master and servant."  399 So. 2d at 294.
>
> A master servant relationship is *not* created, however, when the

> owner merely retains the right to supervise or inspect work of an
> independent contractor as it progresses for the purpose of
> determining whether it is completed according to plans and
> specifications, and retains the right to stop work that is not properly
> done. *Pate v. United States Steel Corp.*, 393 So. 2d [992,] at 995
> [(Ala. 1981)].

*Weeks,* 419 So. 2d at 1383.  Accordingly, to determine whether an exception exists to the general

rule of "no duty," the court must examine the key element of control.

Alabama courts look to two categories of evidence to resolve the control issue: "the terms

of the contract between the parties and the conduct of the premises owner." *Ramirez v. Ala.*

*Power Co.*, 898 F. Supp. 1537, 1542 (M.D. Ala. 1995) (citing *Pugh v. Butler Tel. Co.*,  512 So.

2d 1317 (Ala. 1987)).  The court has carefully reviewed the contract between Cingular and Beta

Com, Wheeler's employer.  The contract expressly characterizes Beta Com as an independent

contractor: " [Beta Com] is engaged in an independent business and will perform all obligations

under this Agreement as an independent contractor and not as the agent or employee of

CINGULAR."  Further, the contract provides that Beta Com "retains the right to exercise full

control of and supervision over the performance of the Services and full control over the

employment, direction, assignment, compensation, and discharge of all personnel performing the

Services."  The court finds that its terms are unambiguous, and they establish that Cingular did

not retain or reserve the right to control the manner in which Beta Com performed its work.

Although Cingular did retain the right to inspect and the contract required that the

contractor have a safety policy in effect, those provisions do not change the relationship to one of

master-servant.  *See Pate v. United States Steel Corp.*, 393 So. 2d at 995 (stating that the

reservation of a right to inspect does not change the relationship from one of independent

contractor to agent); *Stovall v. Universal Constr. Co.*, 893 So. 2d 1090, 1098 (Ala. 2004) (stating

that the "a 'general administrative responsibility for company-wide safety' is insufficient to find

liability for failure to provide a safe workplace"); *Daniels v. Mead Coated Board, Inc.*, 858 F.

Supp. 1003, 1005 (M.D. Ala. 1994) (granting summary judgment in favor of owner where the

owner supplied a safety manual to each contractor at its job site and required compliance with the

provisions of the manual).

      Having examined the terms of the contract and found no retention of control, the court

next turns to the conduct of the parties to see if the conduct belies the contract terms.   The only

conduct that Wheeler points to is (1) Don Stoehr's conduct on March 7, 2006, requiring Beta

Com to reconfigure the equipment racks and install a microwave; (2) Don Stoehr's conduct on

March 7 and March 9, 2006, telling the Beta Com crew that the project needed to be finished by

Friday; (3) Terry Newberry's phone conversation requiring the contractors to meet project

deadlines and work out schedule conflicts among themselves; and (4) Gabe Bruyznski's giving

Wheeler an explanation of the equipment building floor plans in a phone conversation.  Having

examined the testimony, the court finds that Wheeler has not established a genuine issue of

material fact on the control issue.

      With respect to Don Stoehr's actions, Wheeler testified that "Don never told me *how* to

do my job, no." (emphasis supplied).  The evidence demonstrates that Wheeler did not even meet

Stoehr until three days before the accident, when Wheeler had been on the job for about a week;

Stoehr's presence at the job site was not constant, but he arrived after Beta Com had done some

work to inspect it.  Cingular retained the right to inspect the work, and when Wheeler

misunderstood the floor plan explained to him over the phone, Cingular, through Stoehr, had a

right to point out that the work was not properly done and require Beta Com to fix it.  By requiring Beta Com workers to fix work not done according to the floor plan and by giving them a deadline to complete the work, Cingular was not controlling the *manner* of performance.

In *Pate v. U.S. Steel Corp.*, the Alabama Supreme Court found that premises owner U.S. Steel's visiting the furnace work site with blueprints, pointing out deviations from the contract, and requiring the deviations to be corrected were not activities establishing control over the manner of constructing the furnace.    393 So. 2d at 995.  The court said that achieving the "results contemplated by the contract" was a legitimate goal of the owner and supervising the independent contract's work to see that it complied with the contract did "not alter the general rule" of no duty.  *Id.*  It explained:

> The mere retention by the owner of the right to supervise or inspect work of an independent contractor as it progresses, for the purpose of determining whether it is completed according to plans and specifications, does not operate to create the relation of master and servant between the owner and those engaged in the work.  This rule is not altered by the fact that the employer may stop work which is not properly done.

*Id.*  (quoting 41 Am. Jr. 2d *Independent Contractor* § 10 (1968)).  The Supreme Court affirmed the trial court's grant of U.S. Steel's motion for a directed verdict, finding that U.S. Steel  owed no duty to its builder's employees.  *See also Daniels v. Mead Coated Board, Inc.*, 848 F. Supp. 1103, 1105 (M.D. Ala. 1994) (granting owner's motion for summary judgment because the premises owner did not owe a duty to provide a safe workplace where "[t]he only evidence of [the owner's] direct participation in the project is that [the owner's] engineers visited the construction site daily to monitor [contractor's] progress and to insure that the construction complied with the specifications contained in the contract. . . .")

The court finds that the conduct Wheeler identified – inspecting work, requiring non-complying work to be fixed, setting project deadlines, and giving project floor plans – fails to raise a genuine issue of fact to defeat Cingular's evidence that it did not *control the manner in which Beta Com performed its work*. In summary, the court finds that neither the terms of the contract nor the conduct of Cingular raises a genuine issue of material fact on the control issue; it finds as a matter of law that Cingular did not retain control over the manner in which its independent contractor, Beta Com performed its work.

Wheeler argues, however, that Cingular is liable for his safety under an exception to the general rule of "no duty": the intrinsically dangerous doctrine. In *Procter & Gamble Co. v. Staples*, 551 So. 2d 949, 953 (Ala. 1989), the Supreme Court of Alabama explained the Alabama law in premises liability cases as follows:

> [W]e have required that the plaintiff prove that the defendant exercised control over job site *and* control over the manner in which the work was to be done, *and* prove either that the work was *intrinsically dangerous* or that the defendant had undertaken to provide safety on the jobsite. *In many cases, defendants have proven by competent evidence either that they had no control over the jobsite or that they had no control over the manner in which the work was performed. In those cases, we have consistently refused to permit a finding of liability.* The justification for this exception is obvious: the parties charged with providing a safe workplace are the ones who either have assumed or have been delegated the duty to do so, or who are in such a position that the jobsite functions as they command.

551 So. 2d 949, 953 (Ala. 1989) (emphasis supplied).

In *Ramirez v. Ala. Power Co.*, the federal court sitting in the Middle District of Alabama quoted and applied this language to grant summary judgment in favor of Alabama Power Company, the premises owner, in a case asserting the inherently dangerous activity exception.

17

Finding that the plaintiff failed to offer any evidence that the Power Company's retained control over the work in question, the court found that the Power Company was entitled to a judgment as a matter of law and, thus, it did not address the question of whether the work itself was inherently or intrinsically dangerous.  898 F. Supp. 1537, 1544-5 (M.D. Ala. 1995).

Similarly, the Eleventh Circuit in *Callaway v. PPG Indus., Inc.* relied on the same *Staples* case and the same language from that case quoted above in addressing an "inherently dangerous" theory of liability against a premises owner.  155 Fed. App'x 450, 454 (11th Cir. 2005). Affirming the district court's grant of summary judgment in favor of the premises owner, the court explained that, because it agreed with the district court's ruling that the premises owner retained no control over the work in question, "we doubt that we can impose liability on [the premises owner] under the inherently dangerous act doctrine."  *Id.* at 454.

In the instant case, no matter how dangerous the work around the tower site may have been, Wheeler must demonstrate that Cingular *retained control* of the manner in which the work was done.  The court has already found that Cingular did not retain control over the manner in which Beta Com performed its work.  To the extent, however, that the alleged intrinsically dangerous work was the *tower* work, no dispute exists on this issue; Cingular does not do tower work.  Cingular had no contract with ALT, the contractor who did the tower work; its contract was with NSORO, who then contracted with ALT.  Accordingly, the court will simply focus on Cingular's conduct in connection with ALT's work.  No Cingular employee was present on the day of the accident, and Wheeler has provided no evidence that Cingular directed the manner in which ALT did the tower work.  Wheeler's only argument that Cingular controlled the actions of ALT is based upon Terry Newberry's phone conversation with Damon Depew.  The conversation

18

related to the upcoming project deadlines and the request of Cook, ALT's tower leader, for more time.  Cook was uncomfortable working overhead of the Beta Com crew.  However, the undisputed testimony is that the Cingular employees simply told ALT employees that the subcontractors "needed to work it out between themselves so that everyone had time to finish." Further, as discussed *infra*, Wheeler admits that this conversation did not provide Cingular with knowledge that the ALT crew would be working on top of the Beta Com crew on March 10, 2008.  Setting a project deadline and telling the subcontractors to work out scheduling among themselves to meet the deadline is not controlling the manner of work performance.  Because the court finds that Cingular has proven that it retained no control over the manner of the site contractors' performance and Wheeler has raised no genuine issue of material fact that Cingular retained control, the court finds that Cingular cannot be held liable under Alabama's intrinsically dangerous doctrine.   Because Wheeler failed to raise a factual issue on the control issue, the court need not reach the issue whether the work in question was inherently dangerous; control is a necessary element for recovery under that doctrine.  *See Ramirez*, 898 F. Supp. at 1544 n. 5. Count Two of Wheeler's Complaint alleging Cingular's liability as the premises owner must fail as a matter of law, and the court will grant judgment in favor of Cingular.  As no further Defendants remain in this Count, the court will dismiss Count Two.

**B.  Count One of the Complaint:  Negligence/Wantonness of Cingular and WesTower**

**1.  Cingular's Liability under Count One**

In Count One of the Complaint, Wheeler alleges that Cingular knew that replacing an antenna on the tower in question posed a substantial risk of injury to the individuals working

below, including Wheeler, and was under a duty to warn them of the danger.  As discussed

previously, Defendant Cingular argues that, as premises owner, it had no duty to warn the

employees of its independent contractor of the danger posed by objects falling from a tower.

The Supreme Court of Alabama has explained the duty to warn in the context of a

premises owner's liability to an independent contractor as follows:

> In discussing a premises owner's liability towards an independent
> contractor, this Court has recognized that an " ' " owner of premises is
> not responsible to an independent contractor for injury from defects or
> dangers which the contractor knows of, or ought to know of." ' " *Ex
> parte Meadowcraft Indus., Inc.*, 817 So. 2d 702, 706 (Ala. 2001)
> (quoting *Glenn v. United States Steel Corp.*, 423 So. 2d 152, 154 (ala.
> 1982), quoting in turn *Veal v. Phillips*, 285 Ala. 655, 657-58, 235 So.
> 2d 799, 802 (1970)).  Moreover, " '[t]here is no duty to warn' ... an
> independent contractor who has equal or superior knowledge of a
> potential danger.'" *Fielder v. USX Corp.*, 726 So. 2d 647, 650 (Ala.
> 1998) (quoting *Alabama Power Co. v. Williams,* 570 So. 2d 589, 592
> (Ala. 1990)).  Rather a premises owner's duty to warn arises when the
> owner is aware " 'of dangers that are hidden on or inhere in that
> property.'" *Farr Metal, Inc. v. Hines*, 738 So. 2d 863, 864 (Ala. 1999)
> (quoting *McGregory v. Lloyd Wood Constr. Co.*, 736 So. 2d 571, 575
> (Ala. 1999), ultimately quoting *Gulf Oil Corp. v. Bivens*, 276 F. 2d
> 753, 758 (5 th Cir. 1960) (emphasis omitted)).  A party claiming that a
> duty to warn existed must show: (1) that the defect or danger was
> 'hidden'; (2) that it was 'known to the owner'; and (3) that it was
> 'neither known to the contractor, nor such as he ought to know.'"
> *Meadowcraft,* 817 So. 2d at 706 (quoting *Glenn v. United States Steel
> Corp.*, 423 So. 2d at 154).

*Roberts v. Nasco Equip. Co.*, 986 So. 2d 379, 383-4 (Ala. 2007).

For Wheeler to establish a *prima facie* case under this doctrine, he must prove all three

of the elements listed.  In the instant case, Cingular argues that it cannot be liable under this

doctrine because Wheeler cannot prove any of the three elements; it asserts that the tower

danger was not hidden but open and obvious; that  Cingular did not know of the danger and

certainly did not have superior knowledge to Wheeler; and that Wheeler knew or ought to know about the danger.  Because a failure of any of these three elements destroys Wheeler's *prima facie* case and renders summary judgment appropriate, the court will address Cingular's strongest argument first: that Cingular did not know about the danger, or at the very least, did not have knowledge of the danger that was superior to that of Wheeler.

To survive summary judgment on this doctrine, Wheeler not only provide evidence that the premises owner had knowledge of the danger, but also must prove that its knowledge is superior to his own.  As Wheeler acknowledges, "'[t]he entire basis of an invitor's liability rests upon his *superior knowledge* of the danger which causes an invitee's injuries.  Therefore, if that *superior knowledge* is lacking. . . the invitor cannot be held liable."  *Sessions v. Nonnemann,* 842 So. 2d 649, 652 (Ala. 2002) (emphasis added).  In the instant case, the alleged "hidden" danger is the fact that the ALT crew members were working on the tower on March 10, 2008.  Accordingly, the court must first examine the evidence about Cingular's knowledge of that danger.

In his brief opposing ALT's motion for summary judgment, Wheeler appears to concede that Cingular did not know about the danger on March 10:

> There is <u>no evidence</u> that the ALT crew told Damon Depew [the Cingular project manager for the tower work] that it would be working overhead on March 10, the day this accident occurred. A mere notification to Damon Depew that ALT was uncomfortable with the prospect of working over the Betacom crew does not tell Damon Depew, Terry Newberry [the head of the equipment division of Cingular's engineering department on this project] or anyone else <u>when</u> ALT was going to be working over Betacom.

(doc. 165, at 23) (emphasis supplied).  Obviously, Cingular knew – as did Wheeler – that ALT

21

would be working in the tower at some point.  But as Wheeler and Cingular both note, the key

bit of knowledge was *when* the ALT crew would be working in the tower above Beta Com

employees.  The evidence in the record is that Cook had communicated to Cingular his

discomfort in working above Beta Com, and that Cingular's response was for the contractors to

work out their conflicting schedules among themselves.  No evidence exists that Cingular knew

what schedule the contractors had worked out, if any.  No evidence exists that Cingular knew

*when* ALT was working on the tower, except for the alleged statement of Gabe Bruyzinski,

Cingular's project manager, to Wheeler that the ALT crew would be working on the tower on

*March 13, 2006*; that statement does not support any assertion that Cingular knew the ALT crew

would be working on the tower above Beta Com crew members on *March 10, 2006*.  Cingular

was not on site on the day of the accident, *but Beta Com was*.  The court finds that Wheeler has

not provided evidence that Cingular had knowledge that ALT would be working above Beta

Com on the tower on March 10, 2006.

Even assuming *arguendo* that Wheeler has proven that Cingular had some vague

knowledge that Cingular *might* be working on the tower during the week of the accident,

Wheeler has not demonstrated that Cingular's knowledge was superior to that of Wheeler.

Wheeler claims he did not know that ALT was working in the tower, but he admits to knowing

that ALT was on site that day.  ALT points to evidence that, it argues, shows Wheeler knew of

ALT's presence on the tower.  All of this evidence raises a question of fact whether Wheeler

*subjectively* did not know about the ALT crew working in the tower, and the court need not

address whether these facts raise a genuine issue regarding whether Wheeler reasonably should

have known.  At the very least, however, Wheeler has failed to provide evidence that Cingular

had knowledge superior to his own.

In any event, the court finds that Wheeler has failed to prove his *prima facie* case on the duty to warn theory against Cingular, and the court will grant judgment in favor of Cingular as to Count One.  Because the court has entered judgment in favor of Cingular as to all counts that involve that Defendant, the court will GRANT Cingular's motion for summary judgment and dismiss Cingular as a Defendant.

### 2.  WesTower's Liability under Count One

In Count One of his Complaint, Wheeler claims that WesTower had a duty to warn him of the danger posed by the activity in the tower on March 10, 2006.  WesTower filed the instant motion for summary judgment, claiming that Wheeler was an employee of its subcontractor and invoking the general rule that "a contractor owes no duty to the subcontractor whom he has employed."  (doc. 123, at 11) (citing *Stovall*, 893 So. 2d at 1096).  Plaintiff Wheeler has filed no response to that motion.  Accordingly, the court will deem that Wheeler has abandoned his claims against WesTower, will enter judgment in favor of WesTower on Count One.

### C.  Count Three of the Complaint: *Res Ipsa Loquitur* against WesTower

In Count Three of the Complaint, Wheeler claims that WesTower had full management and control of the antenna(s) that caused his injury and claims that WesTower is liable under the doctrine of *res ipsa loquitur.*  In its motion for summary judgment, WesTower argues that no evidence exists of WesTower's full management and control of the antenna in question and raising alternate theories as to causation.  As noted, Wheeler has filed no response to WesTower's motion.  Accordingly, the court will deem that Wheeler has abandoned his claims

against WesTower for *res ipsa loquitur* and will enter judgment in favor of WesTower on Count

Three.  As the court will enter judgment in favor of WesTower on the only counts that refer to

that Defendant, the court will GRANT WesTower's motion for summary judgment and dismiss

WesTower as a Defendant.


## IV.  CONCLUSION

For the reasons stated above, the court will GRANT Cingular's motion for summary

judgment and will GRANT WesTower's motion for summary judgment.  Thus, summary

judgment will be entered in favor of Cingular and WesTower and the claims against them will

be dismissed with prejudice.


Dated this 7th day of October.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE

24